[Cite as *State v. Adams*, 2026-Ohio-372.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. Nos. 30520; 30527 |
| Appellee | : | |
| | : | Trial Court Case Nos. 24-CRB-1586; |
| v. | : | 24-TRD-1103 |
| | : | |
| DESHARI J. ADAMS | : | (Criminal Appeal from Municipal Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on February 6, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

*Mary K. Huffman*

_____
MARY K. HUFFMAN, JUDGE

LEWIS, P.J., and TUCKER, J., concur.

L. PATRICK MULLIGAN and FRANK MATTHEW BATZ, Attorneys for Appellant
DONALD HURST, Attorney for Appellee

HUFFMAN, J.

{¶ 1} In this consolidated appeal, Deshari Adams appeals from a judgment entry of conviction, following a bench trial, for failing to stop at a railroad grade crossing, violating a school bus regulation, and endangering children. For the following reasons, the judgment of the trial court is affirmed.

**Facts and Procedural History**

{¶ 2} On March 6, 2024, Adams was cited for failure to stop at a railroad grade crossing (R.C. 4511.63). The underlying incident occurred on February 29, 2024, at 6:30 a.m. on Gettysburg Avenue while Adams was driving a school bus for Dayton Public Schools ("DPS"). At the time, one student was on Adams's bus. Adams pleaded not guilty on March 20, 2024. On April 17, 2024, Adams was additionally cited for violating a school bus regulation violation (R.C. 4511.76) and stopping at a railroad grade crossing (R.C. 4511.62), to which she pleaded not guilty.

{¶ 3} In a separate matter, on May 24, 2024, Adams was charged by way of complaint with one count of endangering children based on the March 6, 2024 citation. She pleaded not guilty on June 24, 2024.

{¶ 4} The consolidated bench trial occurred on September 9, 2024. In the course thereof, the State withdrew the R.C. 4511.62 charge, and Adams was convicted of the remaining offenses. Disposition occurred on June 17, 2025, and Adams was fined $50.00 for the moving violations. She was sentenced to non-reporting community control for one

year for endangering children, and the court imposed a fine of $150.00. Before addressing Adams's assigned errors, we review the transcript of the bench trial.

{¶ 5} Shetoria Combs, a bus driver for DPS, testified that on February 29, 2024, at around 6:30 a.m., she stopped at a railroad crossing at Gettysburg Avenue and James H. McGee Boulevard, and pursuant to standard procedures to look and listen for trains, she activated her hazard lights within two to three hundred feet of the railroad tracks. She also activated her parking brake, put her bus in neutral, opened her door, opened her window, and "hit my kill switch." At the same time, she observed another bus pass her from behind and keep going. Combs "got on the radio and said, really 108?" She stated that she spoke on the radio directly to the driver who had just passed her, who turned out to be Adams.

{¶ 6} Combs described the railroad crossing as short and narrow, with bushy trees on either side, and she said that it was dark outside at the time of the incident. When asked about the location of Adams's bus, Combs testified, "I'm assuming they were in the process of going around me because once I got done closing my doors and was putting my bus back into drive and releasing my parking brake, that's when I seen the bus just come right past me."

{¶ 7} Mittie L. Anderson, a supervisor at DPS transportation, testified that on February 29, 2024, she was driving behind Adams, and she witnessed Adams pull in front of another bus and cross the railroad crossing contrary to standard procedures, which obligated Adams to "stop and make sure that it is safe to cross, no train was coming." Anderson noticed a student who appeared to be under twelve years old on Adams's bus. Anderson pulled over to determine who was driving the bus, and then Adams "stopped and came to my truck, and we had a conversation there." Anderson told Adams that "she couldn't go around the other bus at the railroad crossing and proceed on, it was dangerous," and Adams responded,

3

"Okay." Consistent with Combs's testimony, Anderson described the area of the railroad stop as dark, due to the time of day, and full of trees, and it was "really hard to see from where she was." Anderson reported the incident to her supervisor. Anderson acknowledged that Adams "did a procedure," but that she did so behind the bus in front of her. Anderson acknowledged that she did not remove Adams from the bus, Adams finished her morning route, and Adams completed an afternoon route.

{¶ 8} Brandon Calhoun, the Director of Transportation for DPS, identified a video he downloaded from Adams's bus, and it was played for the court. The video shows Adams stopping behind the bus in front of her bus and looking both ways. Calhoun testified that Adams was "too far back to be able to see if the railroad is clear." He noted that she opened the door to the bus but then there "was another bus that the employee went around to go across the railroad crossing." A separate video showing a child on the passenger side of bus was also played for the court. Both videos were admitted.

{¶ 9}  On cross examination, Calhoun testified:

So, when you pull up to those tracks, one, you have to be within the amount of space that's required but when you pull up to the tracks you need to be able to see and make sure that everything is clear. When Miss Adams pulled up to the tracks, if you are looking at that stop specifically, there are trees, trees completely going down one side. So, there is no way to see from that far back. So, how would that have been a safe stop? Like I said, Miss Adams fully did a procedure. I'm not disputing that at all. Safe, is what I question.

{¶ 10} Heather Free, a pupil transportation program administrator for the Ohio Department of Educational Workforce, testified that her office oversees the training programs for school transportation drivers in Ohio. She stated that for student safety, when

4

school bus drivers are within approximately 300 feet before a railroad crossing, state and federal policies require school bus drivers to advise their passengers to be silent. At approximately 100 feet, bus drivers must "activate their ambers, open the driver's side window, then as they approach they would be between fifteen and fifty feet from the rail. Once they're in place, stop, they would set their service brake, open the service door, and they proceed with the procedure looking left and right to make sure there is no evidence of a train coming." Free reiterated that the distance requirements for stopping at railroad crossings are 15 to 50 feet from the track rail. She stated that buses "tend not to accelerate as quickly as personal vehicles," and fatalities are typical in bus-train collisions.

{¶ 11} Sergeant Mark Murray of the Dayton post for the Ohio State Highway Patrol testified that he was notified of the incident involving Adams and responded to the DPS transportation office, where he spoke with Calhoun. Murray then proceeded to the scene of the violations at Gettysburg Avenue just north of James H. McGee Boulevard. Murray observed obstructions, including heavy brush and trees, to the left side view of the railroad tracks for a driver headed north. Murray had learned that the bus driven by Combs was 38 feet long, so he measured from the railroad track to the stop bar and then from the stop bar backwards 38 feet to ascertain the approximate location of back of Combs's bus. And "then assuming some space between the buses and approximate distance to the front bumper of the second bus," Murray determined that the rear of Combs's bus was 59 feet from the tracks. Murray indicated that according to regulations, "the minimum distance is fifteen feet and the maximum distance for the bus to be is 50 feet back from that rail and within that fifteen to fifty is where the crossing procedure has to be performed."

{¶ 12} Murray identified photos he took of the scene. He testified that they reflect a "very limited view down the left side of the tracks towards the west." Murray stated that while

5

he was photographing the scene, a DPS bus appeared, and with the driver's permission, he entered the bus and "took a picture from the driver's viewpoint down the left side of the tracks." The bus was at an appropriate distance from the tracks, according to his testimony, and the photo reflects a "very limited view" down the left side of the tracks. Murray said that that photo reflected "approximately where the first bus would have been." Murray stated that it previously had been brought to his attention that the rail service and the property owner at the intersection had received complaints about the hazardous nature of the crossing.

{¶ 13} Adams testified that she had been a DPS bus driver for two to three years at the time of the incident. She stated that when she reached the railroad crossing, she observed another bus "just sitting there" ahead of her. Adams activated her hazard lights, opened her window, "did everything I needed to do, turned my radio off." She also opened her door, looked to the right and left, and she did not see a train. Adams testified that she did not see any lights indicating that a train was approaching, and there "was no gate coming down, nothing." She specifically stated that there were "no trees in the way." According to Adams, she had "a clear view" of the crossing and "could see that a train wasn't coming," and if she had any doubt about the presence of a train, she would not have proceeded around the bus. Adams indicated that she believed that the bus in front of her had broken down, and she was concerned about completing her route on time. She was not aware of her distance from the railroad railing, but she "could see from where I was at." She believed that she executed proper procedures before crossing, and she stated that she would never have exposed a student to any risk of harm on her bus.

## Assignments of Error and Analysis

{¶ 14} Adams asserts three assignments of error. We start by considering her first and second assignments of error together. Therein, she claims that her convictions for

6

violating R.C. 4511.63 and endangering children were based upon insufficient evidence and were against the manifest weight of the evidence. Specifically, Adams argues that she proceeded through the railroad crossing after exercising due care as required by R.C. 4511.63. She further argues that she "did not act recklessly to create a substantial risk to the health or safety of a child," and a finding that she "endangered the health or safety of a child required the trial court to make inference upon inference in order to transform a speculative risk into a substantial risk."

Standard of Review

{¶ 15} In *State v. Thompkins*, 78 Ohio St.3d 380, (1997), the Supreme Court of Ohio clarified the distinction between appellate review of the sufficiency of the evidence and appellate review of the weight of the evidence. A sufficiency of the evidence argument relates to whether the State "presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2009-Ohio-525, ¶ 10 (2d Dist.), citing *Thompkins*. "In essence, sufficiency is a test of adequacy. Whether the evidence is sufficient to sustain a verdict is a question of law." *Thompkins* at 386.

{¶ 16} The test for sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259 (1991):

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the

7

prosecution, any rational trier of fact could have found the essential elements

of the crime proven beyond a reasonable doubt.

*Id*. at paragraph two of the syllabus. In other words, on review for sufficiency, courts are to assess not whether the State's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. *Thompkins* at 390.

{¶ 17} A weight of the evidence argument, on the other hand, challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive. *Wilson* at ¶ 12, citing *State v. Hufnagel*, 1996 WL 501470, *3 (2d Dist. Sept. 6, 1996). The proper test to apply to a manifest weight of the evidence inquiry is set forth in *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983):

[T]he court, reviewing the entire record, weighs the evidence and all

reasonable inferences, considers the credibility of witnesses and determines

whether in resolving conflicts in the evidence, the jury lost its way and created

such a manifest miscarriage of justice that the conviction must be reversed

and a new trial ordered.

"In order to find that a manifest miscarriage of justice occurred, an appellate court must conclude that a guilty verdict is 'against,' that is, contrary to, the manifest weight of the evidence presented." *Wilson* at ¶ 14, citing *State v. McDaniel*, 1998 WL 214606 (2d Dist. May 1, 1998). "Typically, in manifest weight review, we defer to trial court decisions on credibility issues, as those courts are in the best position to make that determination." *State v. Curtis*, 2020-Ohio-4152, ¶ 20 (2d Dist.), citing *State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997).

{¶ 18} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a

conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." *State v. Flores-Lopez*, 2017-Ohio-690, ¶ 49 (2d Dist.), citing *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.); *accord State v. Robinson*, 2015-Ohio-1167, ¶ 17 (2d Dist.). As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." *Robinson* at ¶ 17, citing *State v. Braxton*, 2005-Ohio-2198, ¶ 15 (10th Dist.).

R.C. 4511.63(A)

**{¶ 19}** The version of R.C. 4511.63(A) in effect at the time of Adams's offenses stated:

> [T]he operator of any bus . . . [or] any school vehicle, . . . before crossing at grade any track of a railroad, shall stop the vehicle and, while so stopped, shall listen through an open door or open window and look in both directions along the track for any approaching train, and for signals indicating the approach of a train, and shall proceed only upon exercising due care after stopping, looking, and listening as required by this section. Upon proceeding, the operator of such a vehicle shall cross only in a gear that will ensure there will be no necessity for changing gears while traversing the crossing and shall not shift gears while crossing the tracks.

By its plain language and in contrast to R.C. 4511.62 (set forth below), which establishes requirements for driving across railroad crossings that are generally applicable to all vehicles, R.C. 4511.63 establishes enhanced safety precautions for specific vehicles, including school buses.

**{¶ 20}** After viewing the evidence in a light most favorable to the State, the record reflects that any rational trier of fact could have found that Adams proceeded across the

railroad tracks without exercising the due care required by R.C. 4511.63(A), and her conviction is supported by sufficient evidence. Likewise, Adams's conviction is not against the manifest weight of the evidence. The trial court clearly credited the State's witnesses over that of Adams, and we defer to the court's assessment of credibility. Adams's testimony that there were "no trees in the way" and that "[i]t was a clear view" is belied by the photos of the intersection, which depict the presence of dense growth obscuring the left side of the train tracks at the intersection. The photo taken by Murray from the school bus stopped close to the intersection reveals that at the scene of Adams's crossing, drivers had very limited visibility of the left side of the tracks. Adams's view was further compromised by her location behind Combs's bus and the darkness of the hour.

{¶ 21} While the video of Adams on the bus shows that she came to a stop, opened her door, and appeared to look and listen, it does not establish that she was able to look in "both directions *along the track* for any approaching train." The video further reflects that Adams paused for only 17 seconds after stopping to complete her procedures, and she did not clarify how she was able to so quickly and definitively conclude that Combs's bus was disabled and unable to move. Instead, Adams's testimony suggests that she relied upon the fact that she did not see flashing lights or the crossing gate drop down at the intersection prior to crossing rather than the enhanced precautions set forth in R.C. 4511.63(A). Since Adams failed to exercise due care after stopping, looking, and listening as required by R.C. 4511.63, her conviction is supported by sufficient evidence and is not against the manifest weight of the evidence. Her first assignment of error is overruled.

R.C. 2919.22

{¶ 22} R.C. 2919.22(A) proscribes endangering children and states: "No person, who is the parent, guardian, custodian, person having custody or control, or person in loco

10

parentis of a child under eighteen years of age . . . , shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." The statute is "aimed at preventing acts of omission or neglect." *State v. Shannon*, 2017-Ohio-31, ¶ 24 (5th Dist.). "Although not stated in R.C. 2919.22, recklessness is the culpable mental state for the crime of child endangering." *Id.*, citing *State v. O'Brien*, 30 Ohio St.3d 122 (1987). "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C). "A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist." *Id.*

{¶ 23} Again, after viewing the entire record, we conclude that Adams's conviction is supported by sufficient evidence and is not against the manifest weight of the evidence. For the same reasons discussed in Adams's first assignment of error, the specific circumstances of the obscured railroad crossing and the manner in which Adams proceeded across demonstrated reckless conduct that created a substantial risk to the child on the bus. Put differently, due to the lack of visibility, Adams's reliance on the absence of signals indicating the approach of a train recklessly put the child on board her bus at risk. This is especially so given the often-fatal nature of collisions between trains and buses highlighted by Free, a pupil transportation program administrator, and the corresponding need for the enhanced safety precautions prescribed by R.C. 4511.63. The concern for this known risk is further reflected in the treatment of school bus drivers who commit railroad crossing violations. Adm.Code 3301-83-06(B)(4)(d) disqualifies school bus drivers who have "any railroad crossing violation during the past year as evidenced by a conviction, video, or report by a

11

railroad official." R.C. 4506.16(D)(7) requires the registrar of motor vehicles to disqualify holders from operating commercial vehicles for not less than 60 days upon a first conviction involving a violation of any provisions of R.C. 4511.61 to 4511.63 (prescribing the rules for crossing railroad tracks). The procedures mandated by R.C. 4511.63(A) make clear that reliance alone on signals indicating the presence of an approaching train, such as flashing lights and a lowered cross bar, is insufficient for a safe railroad crossing. The record in this case indicates that from her vantage point, Adams could not have properly determined that no train was approaching. Accordingly, Adams's second assignment of error is overruled.

{¶ 24} Finally, the record reflects that Adams did not develop any argument or cite any authority relating to the school bus regulation violation in her brief. R.C. 4511.76 states in part that no person shall operate a school bus "in violation of the rules of the department of education." It is Adams's obligation to demonstrate error on appeal; it is not our role to develop arguments for her. *Fontain v. H&R Cincy Properties, L.L.C.*, 2022-Ohio-1000, ¶ 87 (12th Dist.), citing *Ditech Fin., L.L.C. v. Ebbing*, 2019-Ohio-2077, ¶ 18 (12th Dist.), and App.R. 12(A)(2) and 16(A)(7).

{¶ 25} In her third assignment of error, Adams argues that "the trial court abused its discretion by either applying the wrong legal standard or misapplying the correct legal standard to relevant facts." According to Adams, the court "combined the standard" set forth in R.C. 4511.62 with R.C. 4511.63 and Adm.Code 3301-83-12. She claims that the State "focused on whether [she] executed her safety procedures between fifteen and fifty feet of the tracks," but the State "voluntarily withdrew" the charge pursuant to R.C. 4511.62.

{¶ 26} Adams directs our attention to the entirety of R.C. 4511.62(A)(1) which states:

(A)(1) Whenever any person driving a vehicle or trackless trolley approaches

a railroad grade crossing, the person shall stop within fifty feet, but not less

than fifteen feet from the nearest rail of the railroad if any of the following circumstances exist at the crossing:

(a) A clearly visible electric or mechanical signal device gives warning of the immediate approach of a train or other on-track equipment.

(b) A crossing gate is lowered.

(c) A flagperson gives or continues to give a signal of the approach or passage of a train or other on-track equipment.

(d) There is insufficient space on the other side of the railroad grade crossing to accommodate the vehicle or trackless trolley the person is operating without obstructing the passage of other vehicles, trackless trolleys, pedestrians, or trains, notwithstanding any highway traffic signal indication to proceed.

(e) An approaching train is emitting an audible signal or is plainly visible and is in hazardous proximity to the crossing.

(f) There is insufficient undercarriage clearance to safely negotiate the crossing.

(g) There is insufficient space on the other side of the railroad grade crossing to accommodate the vehicle or trackless trolley the person is operating without obstructing the passage of other on-track equipment.

(h) Approaching on-track equipment is emitting an audible signal or is plainly visible and is in hazardous proximity to the crossing.

{¶ 27} Adams further directs our attention to the general safety procedures set forth in Adm.Code 3301-83-12 as follows:

(B) Railroad grade crossings

(1) The school bus driver will follow procedures described in the current version of the school bus driving evaluation form (www.education.ohio.gov).

(2) General procedures

(a) For improved vision and hearing, a window at the driver's left will be opened and radios and other noisy equipment (e.g. fans) will be turned off upon approaching the crossing and remain off until the bus has cleared the crossing.

(b) The driver of any school bus, with or without passengers, will come to a complete stop, set the parking brake, shift to neutral, engage the noise suppression switch, fully open the service door, and look and listen in both directions along the track or tracks for approaching engines, trains, or train cars.

(c) After a train has passed the crossing, the bus driver will not drive the bus onto any tracks until the driver is certain that no train, hidden by the first train, is approaching on an adjacent track.

(d) The school bus driver is to shift the bus into gear, look and listen, close the service door, release the parking brake, and when the driver is certain the crossing can be made safely, drive across the tracks in an appropriate gear without shifting.

(e) Crossing when flashing or audible signals malfunction is only permitted when authorized in accordance with section 4511.62 of the Revised Code.

{¶ 28} Having found that Adams's conviction for violating R.C. 4511.63 is supported by sufficient evidence and is not against the manifest weight of the evidence for the reasons set forth above, her third assignment of error lacks merit. Although there was testimony that bus drivers are required to stop within fifty feet but not less than fifteen feet from the nearest

rail of the railroad, such a requirement is not set forth in R.C. 4511.63. Given that the record establishes Adams's clear violation of R.C. 4511.63(A) for not exercising due care in driving her school bus over the railroad tracks, her suggestion that the trial court relied on R.C. 4511.62 in convicting her lacks merit. Adams's third assignment of error is overruled.

## Conclusion

{¶ 29} Adams's convictions for failing to stop at a railroad grade crossing and endangering children are supported by sufficient evidence and are not against the manifest weight of the evidence, and her assigned errors are overruled. The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

LEWIS, P.J., and TUCKER, J., concur.

15